**Alicia E. MAYA, Individually, and Brianna Maya, by and through her Natural Parent and Guardian**

v.

**JOHNSON AND JOHNSON and McNeil–PPC, Inc.**

**Appeal of McNeil–PPC, Inc., Appellant.**

**Alicia E. Maya, Individually and Brianna Maya, by and through her Natural Parent and Guardian**

v.

**Johnson & Johnson and McNeil–PPC, Inc.**

**Appeal of McNeil–PPC, Inc., Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 12, 2013.

Filed July 22, 2014.

Reargument Denied Sept. 25, 2014.

Alfred W. Putnam, Jr., Philadelphia, for McNeil–PPC, appellant.

Howard J. Bashman, Willow Grove, for Maya, A., appellee.

BEFORE: FORD ELLIOTT, P.J.E., WECHT and MUSMANNO, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

McNeil–PPC, Inc., appeals[1] from the

---

1. Co-defendant Johnson & Johnson was dis-     missed as a party at the conclusion of trial.

order of January 6, 2012,[2] entering final judgment for plaintiffs/appellees for $10 million, plus statutory post-judgment interest, in this pharmaceutical failure to warn case. After careful review, we affirm.

The trial court has aptly summarized the facts of this case as follows:

The salient facts which occurred within a week's span of time and the procedural history, as defined by the pleadings, memoranda, trial testimony and exhibits, can be summarized as follows:

On Saturday, November 25, 2000, Brianna Maya (Brianna) was a three-year old girl residing with her parents [sic] in Martin, Tennessee. That evening, she attended a play with her grandmother, Marilyn Crist, who testified that during the intermission, she called her daughter, Alicia E. Maya (Brianna's mother/Ms. Maya), inquiring whether she should take Brianna home since the child was coughing and felt slightly warm. To not disappoint her daughter, Ms. Maya advised her mother to stay and watch the rest of the play. When she arrived home around 10:30 p.m., Ms. Maya gave Brianna a dose of over-the-counter (OTC) Children's Motrin, a medication manufactured by Defendant McNeil, for the fever that had developed.

Early Sunday morning, November 26, 2000, Ms. Maya was awoken by Brianna, who was still feverish. She gave Brianna a second dose of OTC Children's Motrin. Around 4:00 p.m., Ms. Maya noticed a rash on Brianna's neck near the top of her chest. She did not perceive this rash to be a life-threatening allergic reaction since Brianna had experienced a similar rash sometime in February 1999. This time, however, Brianna's eyes were pinkish. A third dose of OTC Children's Motrin was given to Brianna after Ms. Maya spoke with Susan Brewer, M.D., Brianna's pediatrician, who instructed her to alternate OTC Children's Motrin with OTC Children's Tylenol. Throughout the day, Brianna was given two additional doses of OTC Children's Motrin, alternated with OTC Children's Tylenol for her fever.

Ms. Maya testified that prior to administering the OTC Children's Motrin to Brianna, she read the label and dose instructions. She recalled that the warnings on the label indicated that "hives, wheezing, facial swelling, or shock" could result from consuming OTC Children's Motrin, and to "call your doctor" if symptoms persisted.

Due to Brianna's persistent fever, Ms. Maya decided Brianna should be examined by Dr. Brewer. On Monday, November 27, 2000, Sean Maya, Brianna's father, took his daughter to Dr. Brewer, who examined and diagnosed Brianna with mycoplasma pneu-

---

2. McNeil also appealed from the October 18, 2011 order denying its post-trial motions.

"Generally, an appeal will only be permitted from a final order unless otherwise permitted by statute or rule of court." *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 441 Pa.Super. 281, 657 A.2d 511, 514 (1995). An appeal from an order denying post-trial motions is interlocutory. *Id.;* Pa. R.A.P. 301(a), (c), and (d). An appeal to

this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions. *Id.*
*Fanning v. Davne*, 795 A.2d 388, 391 (Pa.Super.2002), *appeal denied*, 573 Pa. 697, 825 A.2d 1261 (2003). Accordingly, we will dismiss the appeal at No. 3259 EDA 2011 as interlocutory and superseded by the subsequent appeal at No. 471 EDA 2012.

monia, and prescribed Pediazole. Ms. Maya picked up the prescription later that day and when she arrived home around 6:00 p.m., she found Brianna screaming, crying, and complaining that her "pee pee hurt." Ms. Maya observed that Brianna's eyes were red with a runny discharge and that she had a fever, red lips, and a collar of red rash on her chest. After carefully reading the dosing instructions, Ms. Maya gave Brianna a dose of the Pediazole antibiotic, and continued alternating OTC Children's Motrin and OTC Children's Tylenol throughout the evening. Ms. Maya testified that if the warnings on the Children's Motrin label had advised to "stop use" upon presentation of certain symptoms, she would have done so.

On Tuesday morning, November 28, 2000, Brianna was rushed to Volunteer Hospital in Martin, Tennessee, with a rapidly spreading rash over her entire body, her eyes red with discharge, and blisters on her mouth, chest and vaginal area. On Dr. Brewer's recommendation based upon the severity of her worsening condition, Brianna was emergently transferred to Lebonheur's Children's Hospital in Memphis, Tennessee, later that same day.

By the early morning hours of Wednesday, November 29, 2000, Brianna's rash had developed into blisters that rapidly spread and erupted all over her body and her eyes had swollen shut. Because of the increased risk of infection from so many open blisters and wounds, Brianna underwent several debridements (forcefully sloughing off the skin using a highly abrasive material), requiring skin grafts of either pigskin or cadaver skin to pro-

tect the exposed underlying skin. Brianna quickly deteriorated and was monitored in the intensive care unit for rapidly decreasing blood oxygen levels.

On Friday, December 1, 2000, a medical decision was made to transfer Brianna to Shriner's Burn Hospital in Texas, which occurred around midnight via a private jet plane. Upon arrival at Shriner's Hospital, approximately 84.5% of Brianna's total body surface was covered with open, burn-like wounds. (In the presentation of the evidence, the jury was shown numerous photos of Brianna taken contemporaneously with the treatment rendered).

For several days, Brianna's symptoms continued to worsen and she experienced a drop in blood pressure, hypoxia (decreasing oxygen), fluid in her lungs, which had to be continually suctioned out, and internal bleeding, which required multiple blood transfusions. Her open wounds covered the majority of her body to such an extent that family members could only touch the tip of one unaffected toe. Brianna was sedated to help the healing process and relieve the excruciating pain.

Arthur Peter Sanford, M.D., the primary treating burn surgeon at Shriner's Burn Hospital, testified that approximately nine days after the first onset of symptoms, the medical staff determined that the possible cause of Brianna's condition was the ingestion of OTC Children's Motrin (pediatric ibuprofen). Dr. Sanford testified that Brianna's condition was diagnosed as toxic epidermal necrolysis (TEN), described as an especially severe form of Stevens Johnson Syndrome (SJS), a

rare but life-threatening disease that causes severe blistering and sloughing off of skin, together with serious damage to the mouth, eyes, throat, and esophagus. Treatment for the disease is similar to that given burn victims, as the separation of the top layer of skin from the deeper layers of skin, is akin to a second-degree or partial-thickness burn.

Brianna remained hospitalized at Shriner's Burn Hospital until December 16, 2000. Thereafter, she was discharged to the Ronald McDonald House adjacent to the hospital where she remained until December 19, 2000, at which time she and her family returned to Martin, Tennessee. However, because TEN affected the mucus membranes of Brianna's eyes requiring specialized treatment, the family relocated to Clearlake, Texas.

Scheffer Tseng, M.D., Brianna's treating ophthalmologist since 2002, opined that Brianna suffered severe eye damage as a result of the TEN reaction as early as December 3, 2009. Dr. Tseng described part of the eye injuries as adhesion and scar tissue on and between the eyelid and the eyeball, which occurred after the skin sloughed off, causing difficulty with blinking and fully closing the eyelids. Dr. Tseng stated that because of the constantly changing nature of the eyes, a TEN reaction is ongoing and that there is no cure for Brianna's ocular damage or blindness.

Brianna has undergone 16 eye surgeries, all reportedly necessitated because of complications of the TEN reaction. These surgeries were performed at Shriner's Burn Hospital by lead eye surgeon, Brian Wong, M.D.,

primarily to address the eyelid adhesions and to correct a condition where the eye lashes were growing inward. Eventually, the eyelash follicles were removed via electrolysis to prevent the lashes' inward growth and the constant scratching to the surface of the eye balls which was causing eye irritation and damage.

Ms. Maya testified that due to Brianna's TEN complications, Brianna has had to make lifestyle changes which include, *inter alia*, avoiding exposure to sunlight that can be damaging to her eyes; and strenuous activity in high, humid temperatures due to her inability to perspire normally, pulmonary fibrosis, and the scarring in the lungs which makes respiration difficult and increases the risk of asthmatic attacks and upper respiratory infections.

Steven Pliskow, M.D., an expert obstetrician gynecologist, testified that Brianna suffered gynecological complications due to TEN, which became more evident as Brianna matured into a young lady. He described the fact that Brianna suffered a complete fusion of both sides of the vaginal wall, which resulted in hematometra and retrograde menstruation, as confirmed by a MRI and ultrasound. Both conditions involved blocked blood in Brianna's uterus, which because of scarring caused the menses to back up through the Fallopian tubes into the abdominal cavity instead of discharging as normal menstruation. Dr. Pliskow testified that the danger of menstrual blood backing up into the abdominal cavity is that it can lead to infection and/or endometriosis, where the lining of the uterus grows inside the abdomi-

nal cavity, creating further scarring, abdominal pain, and future complications. While several surgical procedures performed by Dr. Pliskow successfully enabled Brianna to have normal menstruation, Dr. Pliskow opined that the extent of damage to her reproductive system caused by TEN will bar her from having normal intercourse and childbirth. He opined that she would be able to produce a child through in-vitro fertilization carried by a surrogate.

Ms. Maya testified that she would *not* have used OTC Children's Motrin if she had seen the word "blisters" on the package because a medicine should not cause blisters. Ms. Maya also testified that she does not believe, based on the 13½ years of administering OTC Children's Tylenol to her daughter, that Brianna has ever had a reaction to OTC Children's Tylenol.

At trial, both parties presented numerous experts who offered opinions addressing causation, what warnings were and should be on the OTC Children's Motrin label, and the relevant scientific studies that had been conducted.

Trial court opinion, 1/7/13 at 4–8 (footnotes and citations to the record omitted) (emphasis in original).

■ Following a nine-week jury trial, the jury found in favor of Brianna Maya and against McNeil in the amount of $10 million on the negligent failure to warn claim.[3] The jury found in favor of McNeil on the remaining claims for negligent design defect and punitive damages. Post-trial motions were denied, and this appeal followed. McNeil complied with Pa. R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed a Rule 1925(a) opinion.[4]

McNeil raises the following issues for this court's review:

1. Did the trial court err in concluding a reasonable juror could find McNeil

---

3. Following presentation of the evidence, Johnson & Johnson and Alicia Maya were dismissed as parties, although Mrs. Maya remained as a plaintiff in a representative capacity. Additional claims including strict liability were dismissed, and the plaintiffs voluntarily withdrew a claim for fraudulent misrepresentation. (*Id.* at 9.)

4. The trial court observes that McNeil's Rule 1925(b) statement was 11 pages, containing 23 paragraphs, some of which contained numerous sub-issues. (Trial court opinion, 1/7/13 at 19.) The trial court advocates waiver, citing this court's decision in *Kanter v. Epstein*, 866 A.2d 394 (Pa.Super.2004), *appeal denied*, 584 Pa. 678, 880 A.2d 1239 (2005), *cert. denied, Spector, Gadon & Rosen, P.C. v. Kanter*, 546 U.S. 1092, 126 S.Ct. 1048, 163 L.Ed.2d 858 (2006), in which this court held that where an appellant's concise statement raises an unduly large number of issues (104 in *Kanter*), the purpose of Rule 1925 is effectively subverted. However, Rule 1925(b) was revised in 2007 and now states, "Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver." Pa.R.A.P. 1925(b)(4)(iv). In addition, in *Eiser v. Brown & Williamson Tobacco Corp.*, 595 Pa. 366, 938 A.2d 417 (2007) (plurality), our supreme court held that a litigant will not suffer the loss of appellate review due to the volume of issues raised in the absence of bad faith. The *Eiser* court also distinguished *Kanter* on the basis that *Kanter* was a relatively straightforward breach of contract action while the lawsuit in *Eiser* was a complicated one with a voluminous record. The court in *Eiser* observed that "on rare occasions a party may, in good faith, believe that a large number of issues are worthy of pursuing on appeal." *Id.* at 427 (footnote omitted). Instantly, as in *Eiser*, the subject lawsuit is complex and the record contains thousands of pages of testimony. Furthermore, there is no evidence of bad faith or an attempt to thwart the appellate process. We note that McNeil did winnow down the number of issues actually argued in its brief on appeal. Therefore, we decline to find waiver.

negligent for failing to change an "Allergy Alert" on over-the-counter Children's Motrin by adding warnings about a specific skin condition (SJS/TEN) when the FDA drafted the Allergy Alert aware of a possible link between ibuprofen and SJS/TEN; the FDA rejected McNeil's requests to strengthen the Allergy Alert; and no additional scientific information was unearthed before the injuries here that showed any need for further warnings?

2. Did the trial court err in concluding a reasonable juror could find that the addition of "skin reddening," "rash," or "blisters" to the Allergy Alert would have caused Alicia Maya to refrain from giving her daughter, Brianna Maya, ibuprofen when Ms. Maya testified that she relied on a doctor's advice rather than the label in deciding to give the medication?

3. Did the trial court err in concluding a reasonable juror could have found the addition of "rash" to the Allergy Alert would have prevented the injuries when (a) Ms. Maya testified she relied on a doctor's advice and the doctor advised her to continue ibuprofen after a rash appeared and (b) no expert testified to a reasonable degree of medical certainty that stopping ibuprofen after the rash would have changed the outcome?

4. Is McNeil entitled to a new trial because the trial court permitted plaintiffs to argue that Brianna Maya's doctor did not understand the relationship between rashes and SJS/TEN, but barred the doctor's testimony that she previously had SJS herself?

5. Is McNeil entitled to a new trial because the trial court told counsel before closings that it would instruct the jury to presume Ms. Maya would have read and heeded their proposed warning if given, thus precluding defense counsel from arguing that the warning would not have mattered, even though the court later did not give the improper instruction?

6. Is McNeil entitled to a new trial because the trial court instructed the jury that it could consider evidence about the withdrawal of other drugs?

7. Is McNeil entitled to a new trial because the trial court instructed the jury that it could find McNeil liable if ibuprofen combined with something else to cause the injury, even though no expert testified that multiple agents combined to cause the injuries?

8. Is McNeil entitled to a new trial because the trial court admitted irrelevant evidence about (a) an alleged failure to warn of un-manifested risks, (b) adverse event reports and other evidence postdating Brianna's injuries, (c) warnings the FDA rejected, (d) advertisements plaintiffs never saw, and (e) foreign regulatory matters?

9. Is McNeil entitled to a new trial because plaintiffs' counsel repeatedly disregarded the trial court's rulings and made prejudicial comments?

10. Did McNeil's Rule 1925(b) statement waive these issues?

McNeil's brief at 4–5.

When reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must de-

termine whether there is sufficient competent evidence to sustain the verdict. *Johnson v. Hyundai Motor America,* 698 A.2d 631, 635 (Pa.Super.1997), *appeal denied,* 551 Pa. 704, 712 A.2d 286 (1998) (citations omitted); *Rowinsky v. Sperling,* 452 Pa.Super. 215, 681 A.2d 785, 788 (1996), *appeal denied,* 547 Pa. 738, 690 A.2d 237 (1997) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa.Super. 194, 657 A.2d 17, 20 (1995)). We must view the evidence in the light most favorable to the verdict winner and give the verdict winner the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. *Johnson, supra* at 635; *Rowinsky, supra* at 788. We apply this standard in all cases challenging the grant of a motion for J.N.O.V. *Shearer v. Reed,* 286 Pa.Super. 188, 428 A.2d 635, 637 (1981).

Pennsylvania law makes clear that a judgment notwithstanding the verdict is proper only in clear cases where the facts are such that no two reasonable minds could disagree that the verdict was improper. *Johnson, supra* at 635; *Rowinsky, supra* at 788. Questions of credibility and conflicts in evidence are for the fact-finder to resolve. *Commonwealth, Department of Transportation v. Patton,* 546 Pa. 562, 568, 686 A.2d 1302, 1305 (1997); *Miller v. Brass Rail Tavern, Inc.,* 702 A.2d 1072, 1076 (Pa.Super.1997) (citation omitted). This Court will not substitute its judgment based upon a cold record for that of the fact-finder where issues of credibility and weight are concerned. *Id.*

*Birth Center v. St. Paul Companies, Inc.,* 727 A.2d 1144, 1154–1155 (Pa.Super.1999).

▮ McNeil's first three issues relate to the negligent failure to warn claim and causation. First, McNeil argues that it is entitled to judgment as a matter of law because its label was drafted by the FDA. McNeil claims that it could not be found negligent for failing to add "skin reddening," "rash," and "blisters" to the list of symptoms in the Allergy Alert when they were not required by the FDA. McNeil is mistaken. *See Wyeth v. Levine,* 555 U.S. 555, 570–571, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (rejecting a federal preemption argument and stating that "it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market."). *See also Daniel v. Wyeth,* 15 A.3d 909, 932 (Pa.Super.2011), *appeal granted in part,* 613 Pa. 217, 32 A.3d 1260 (2011), *appeal dismissed as improvidently granted,* —— Pa. ——, 82 A.3d 942 (2013) (it was for the jury to decide whether Wyeth performed adequate testing of its product before marketing it for sale, regardless of purported compliance with FDA testing requirements).

▮ McNeil also contends that the plaintiffs failed to establish causation, *i.e.,* that adding "skin reddening," "rash," or "blisters" to the Allergy Alert would have prevented or mitigated Brianna Maya's injuries. According to McNeil, Mrs. Maya relied on Dr. Brewer's advice and would have administered OTC Children's Motrin to Brianna with or without the additional warnings.

Proximate cause is an essential element in a failure to warn case. A proximate, or legal cause, is defined as a substantial contributing factor in bringing about the harm in question. Assuming that a

plaintiff has established both duty and a failure to warn, a plaintiff must further establish proximate causation by showing that had defendant issued a proper warning [ ], he would have altered his behavior and the injury would have been avoided. To create a jury question, the evidence introduced must be of sufficient weight to establish ... some reasonable likelihood that an adequate warning would have prevented the plaintiff from receiving the drug.

*Cochran v. Wyeth, Inc.*, 3 A.3d 673, 676–677 (Pa.Super.2010), *appeal denied*, 610 Pa. 604, 20 A.3d 1209 (2011) (internal quotation marks and citations omitted).[5]

Mrs. Maya testified that she would not have administered Children's Motrin to Brianna if the label had warned her about the possibility of skin rashes, blisters etc.

Q. And how, if at all, would it have affected your thought process if you looked at the labels for Tylenol and Motrin and you saw nothing about skin reddening, rash, or blisters on the Tylenol label and you saw that it had that in the Motrin label, and throw in if you had known that Tylenol had a superior safety profile to Motrin, how, if at all, would that have affected your purchasing decision without Dr. Brewer being a part of this equation?

A. It would have been a no-brainer which medication to purchase, and it would have been Tylenol.

Q. Same question for life-threatening skin reactions. Had that been on the Motrin label, but not on the Tylenol label without Dr. Brewer involved, how would that have affected your purchasing decision, if at all?

A. Same thing, the Motrin wouldn't have been purchased.

Q. Is there any relationship between what your thought process would have been in 2000 in making these purchasing decisions and what you told us about on last Thursday, your choice to endure 36 hours of labor pain for a miniscule risk that may last a couple days, like drowsiness?

MS. JONES: Objection.

THE WITNESS: Yes, absolutely.

BY MR. JENSEN:

Q. How so?

A. I went through 36 and-a-half labors (sic) did not get an epidural or any kind of pain medication simply because I did not want my child to have a minimal or small chance of being groggy after being born. And it's that same mindset that, you know, that I tell you that if I would have known that Motrin could cause all of the things that it has caused my daughter, including nearly taking her life, there is no way that I would have purchased it.

Notes of testimony, 4/26/11, a.m. session at 45–46.

McNeil complains that the above hypothetical question excludes Dr. Brewer from the equation, and Mrs. Maya testified that

---

**5.** We note that the learned intermediary doctrine does not apply here because Children's Motrin is an over-the-counter drug, so McNeil's duty of care runs directly to the consumer. "Under the learned intermediary doctrine, a manufacturer will be held liable only where it fails to exercise reasonable care to inform a physician of the facts which make the drug likely to be dangerous." *Cochran*, 3 A.3d at 676 (citation omitted).

she relies on Dr. Brewer's medical advice. She followed Dr. Brewer's recommendation to alternate doses of Tylenol and Children's Motrin. However, Mrs. Maya also testified that she would have stopped administering Children's Motrin when Brianna first broke out in a rash:

> Do you recall I asked you questions about how many additional doses of Motrin you would not have given Brianna if the label that you had hypothetically stated something it did not state, which is, the hypothetical that it would have stated, "Stop use and call your doctor if," as opposed to the label that you got, just said "Call your doctor if," contrary to what the FDA said should be the case; do you recall that?
>
> A. Yes.
>
> Q. So—and do you recall when I asked you that, you said had the label said something it did not state, "Stop use and call your doctor if," that you gave the answer that she would have [sic] not have been given four to five additional doses; do you recall that?
>
> A. Yes, that's correct.
>
> Q. And I want to see whether or not we can clear that up. Were you estimating how many she would not have been given had the label said "Stop use," which it didn't say, or please explain?
>
> A. I said she would not have gotten four to five additional doses simply because of when the rash presented, and the fact that she was given Motrin right around the time that the rash presented, so I said four or five.
>
> Q. So do I have it right that you intentionally said four or five because it happened at the same time?
>
> A. Correct.

Q. Okay. And let me reorient the jury. First of all, this is the label I'm now showing, the one that you had—you believe you had in your possession. It doesn't say "Stop use," it just says "Call your doctor if"?

A. That's correct.

Q. And the jury saw your timeline, and I'm going to go to what you're referring to; and do you understand that this would be your timeline on Sunday at 4:00 p.m.?

A. That is correct.

Q. And tell us what it says here, please, and how it relates to what you just told us that you intentionally said she wouldn't have gotten four or five additional doses, please?

A. At 4 o'clock it says Brianna had red rash on upper chest and lower neck and that she was given a dose of Motrin by me. So that is why I said four or five, because if I would have seen the rash or if it would have said "Rash" she never would have gotten that dose of medication or any of the subsequent doses of medication.

Q. So you said—is it right to say you said four or five because you're not exactly sure which happened first right around 4 o'clock on Sunday?

A. Right, the rash and getting Motrin, that was right in the same timeframe.

Notes of testimony, 4/26/11, a.m. session at 87–89.

Therefore, there was testimony that an adequate warning would have prevented Brianna from receiving the last four or five doses of Children's Motrin. Moreover, two of appellees' expert witnesses testified that stopping the Children's Motrin sooner would have substantially improved Brian-

na's prognosis. (Trial court opinion, 1/7/13 at 44–46.) For example, Randall Tackett, Ph.D., a pharmacologist/toxicologist, testified that it is crucial to stop using ibuprofen right away if the person develops a skin rash or blisters, and that this information should have been included in the 2000 label:

> We know from the literature that has been—it's like with every drug, is that if the drug is causing something, then the sooner you stop it, then the side effect is going to be abated or go away. And so it's very important that it tells consumers that to—they need—if any of these symptoms occur, that they need to stop the drug because these symptoms may be associated with very serious consequences that if you continue to take the drug can develop.

> Q. And here it says, "Stop your NSAID medicine and call your healthcare provider right away if you have any of the following symptoms": And one of the bullet points is skin rash or blisters with fever. Do you see that, Dr. Tackett?

> A. I do.

> Q. Was that information, or any information like it, available on the label in 2000 over the counter when Miss Alicia Maya purchased the Children's Motrin for her daughter, Brianna Maya?

> A. No.

> Q. Should it have been, in your opinion?

> A. Yes, it's very important.

> Q. Why?

> A. Because those are the early signs of SJS and TEN.

Notes of testimony, 3/25/11, a.m. session at 56–58.

> What's very important is we know that if you continue taking the drug, that it can continue to get worse; and so it's important to stop it at the very early signs. And we know that the prognosis or the ability to recover from it is much improved the sooner you stop the drug.

Notes of testimony, 4/4/11, a.m. session at 77–78.

Similarly, John T. Schulz, M.D., testified that stopping the medication sooner would have lessened Brianna's injuries:

> Q. ... And why is it relevant to your conclusion, Dr. Schulz, that she kept taking Motrin?

> A. Well, I mean, it's relevant to the conclusion only insofar as because we know that the causative agent—getting rid of the causative agent as fast as possible might kind of decrease the severity of the syndrome once it starts. It's relevant that she was still getting it as she's getting very ill.

> Q. And do you know of evidence or studies that pertain to that very testimony you just gave, that—

> A. Yes, there are.

> Q. And what is it?

> A. Well, the evidence, Garcia–Doval was the principal author on that paper.

> Q. And what's the evidence that's provided by that?

> A. The evidence is—and it's really the only thing that we have to offer, besides critical care, is try to stop the offending medication; and the evidence was that people in whom it

was stopped faster, or in whom it was stopped and were on very short half-life drugs but washed out of their system fast tended to do better.

Notes of testimony, 3/30/11, a.m. session at 122–123.

Q. And how relevant is it that she's still on Motrin, she's got her 7th dose at 9:00 p.m. Monday night, her 8th dose at, if I can move this and find out, 3:00 a.m. early Tuesday morning, how relevant are these matters to your opinion that she had this—she was getting worse?

A. It matters because she's descending into in [sic] this firestorm of a disease, and the causative agent is still being given. That's why it matters.

*Id.* at 123–124.

Therefore, as the trial court states, there was sufficient evidence presented as to causation:

the evidence of record supports the jury's findings that had the warnings on the label included the language sought by Plaintiffs, Ms. Maya would not have bought the medication, and/or would have stopped giving her daughter the drug at the first signs of symptoms. The injuries Brianna suffered conceivably may not have been as devastating.

Trial court opinion, 1/7/13 at 47.

■■■ Next, McNeil argues that the trial court erred by excluding evidence that Dr. Brewer actually suffered from SJS/TEN herself approximately ten years before Brianna developed SJS/TEN. At trial, plaintiffs' counsel argued that Dr. Brewer was unaware of any relationship between rash and SJS/TEN. Plaintiffs theorized that if the warning label had included this

information, Dr. Brewer would have told Mrs. Maya to stop use immediately. McNeil wanted to rebut this evidence with Dr. Brewer's deposition testimony that she herself had SJS/TEN around 1990. According to McNeil, Dr. Brewer must have known of a relationship between rash and SJS/TEN regardless of the warning label.

"The admissibility of evidence is a matter addressed solely to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion." *Commonwealth v. Marshall,* 743 A.2d 489, 492 (Pa.Super.1999), *appeal denied,* 563 Pa. 613, 757 A.2d 930 (2000) (citation omitted). "Thus our standard of review is very narrow.... To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McManamon v. Washko,* 906 A.2d 1259, 1268–1269 (Pa.Super.2006), *appeal denied,* 591 Pa. 736, 921 A.2d 497 (2007) (citations omitted).

*Klein v. Aronchick,* 85 A.3d 487, 491 (Pa.Super.2014).

First, we observe that plaintiffs' counsel's assertion that Dr. Brewer did not understand the relationship between rash and SJS/TEN is based on the following exchange from her deposition:

Would it be fair or not, Dr. Brewer, to state that because you did not know that Ibuprofen, Motrin could cause SJS and TEN in 2000, that you also did not know that if someone had a rash or other involvement that could be leading to SJS to take them off Motrin? Answer: Yes.

Notes of testimony, 5/16/11, p.m. session at 61. So, Dr. Brewer did not state that she did not appreciate the relationship between rash and SJS/TEN; rather, she

stated that she did not know that ibuprofen could cause SJS/TEN. The trial court agreed, stating,

> Hold on a second. Hold on. Your question is a little different. Your question is if someone doesn't know, if someone had a rash to take them off Motrin. The question that you asked Dr. Stern is that there is a relationship between rash and SJS. It's very different.

*Id.* at 62.[6]

At any rate, McNeil failed to establish that rash is always a precursor to SJS/TEN. Therefore, Dr. Brewer's testimony that she had SJS ten years earlier would not prove that she was aware of a relationship between rash and SJS. The entire premise of McNeil's argument fails. Without proof that rash always accompanies SJS, Dr. Brewer's testimony in this regard is wholly irrelevant. The trial court did not err in excluding this evidence.

■■■■■ Next, McNeil asserts it is entitled to a new trial because the trial court erred by failing to give a heeding presumption instruction to the jury.

> "[I]n cases where warnings or instructions are required to make a product non-defective and a warning has not been given, the plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning, and that the defendant, in order to rebut that presumption, must produce evidence that such a warning would not have been heeded." *Coward v. Owens–Corning Fiberglas Corp.*, 729 A.2d 614, 621 (Pa.Super.1999), *appeal granted*, 560 Pa. 705, 743 A.2d 920

(1999). "If the defendant produces evidence that the injured plaintiff 'was fully aware of the risk of bodily injury, or the extent to which his conduct could contribute to that risk,' the presumption is rebutted and the burden of production shifts back to the plaintiff to produce evidence that he would have acted to avoid the underlying hazard had the defendant provided an adequate warning." *Coward*, 729 A.2d at 622 (quoting *Pavlik v. Lane Limited/Tobacco Exporters International*, 135 F.3d 876, 883 (3d Cir. 1998)).

*Lonasco v. A–Best Products Co.*, 757 A.2d 367, 377 (Pa.Super.2000), *appeal denied*, 566 Pa. 645, 781 A.2d 145 (2001).

> In examining these instructions, our scope of review is to determine whether the trial court committed clear abuse of discretion or error of law controlling the outcome of the case. *Williams v. Philadelphia Transportation Company*, 415 Pa. 370, 374, 203 A.2d 665, 668 (1964). Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. *Glider v. Com. Dept. of Hwys.*, 435 Pa. 140, 151–52, 255 A.2d 542, 547 (1969). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Voitasefski v. Pittsburgh Rys. Co.*, 363 Pa. 220, 226, 69 A.2d 370, 373 (1949); A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a

---

**6.** Plaintiffs' counsel asked Robert Stern, M.D., "For a doctor like Dr. Brewer who does not know there's a relationship between rash and SJS/TEN, there's nothing in this document to tell them that; isn't that true?" (Notes of testimony, 5/11/11, p.m. session at 51.)

prejudicial omission of something basic or fundamental. *Sweeny v. Bonafiglia,* 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); *Giorgianni v. DiSanzo,* 392 Pa. 350, 356, 140 A.2d 802, 805 (1958). In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Electric Company,* 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

*Stewart v. Motts,* 539 Pa. 596, 654 A.2d 535, 540 (1995).

McNeil's argument in this regard is meritless. Initially, at the charging conference, the trial court indicated it would give the instruction, over McNeil's objection. Ultimately, for whatever reason, the trial court did not give the instruction. (Trial court opinion, 1/7/13 at 111.) It appears the trial court may have simply forgotten. Neither side objected to its omission.

Although the heeding presumption benefits the plaintiffs, McNeil now claims it was error not to give it as the trial court indicated it would, because defense counsel presented his closing argument to the jury under the assumption that they would be charged on the heeding presumption. According to McNeil, in light of the trial court's decision, counsel barely touched warning causation in his closing, arguing merely that even an "adequate" warning would not have prevented Brianna from being given her first dose of Children's Motrin. (McNeil's brief at 43.) Allegedly, because of the trial court's stated intention to give the heeding presumption instruction, counsel avoided arguing whether an adequate warning would have caused Mrs. Maya to stop administering the drug to Brianna after she exhibited a rash. (*Id.*)

McNeil complains that, "The trial court ultimately did not give the instruction, but by that point, McNeil had lost the opportunity to argue this central issue." (*Id.*)

First, we note that the matter could be deemed waived. If McNeil felt that it was somehow prejudiced by the trial court's failure to give the instruction, it could have objected to its omission or, in the alternative, requested to re-open closing arguments. McNeil cannot sit on its hands and now argue that failure to give the jury instruction was reversible error. *See Keefer v. Byers,* 398 Pa. 447, 159 A.2d 477, 480 (1960) ("Nor may a party sit by silent, and take his chances on a verdict and then, if it is adverse, complain of a matter which, if erroneous, could have been dissipated timely by the court's prompt rectification of the charge.") (citation omitted).

Second, the heeding presumption charge is a rebuttable presumption and in no way precluded McNeil from arguing to the jury that plaintiffs failed to prove an adequate warning would have prevented Brianna from receiving additional doses of Children's Motrin after she developed a rash and blisters. In addition, as appellees observe, the heeding presumption is most relevant in cases where the plaintiff is dead or incapacitated and cannot testify as to what he would have done if an adequate warning had been given. (Appellees' brief at 38.) Here, Mrs. Maya testified that she would not have purchased Children's Motrin if the label warned of "rash" and "blisters" and/or would have stopped using the product after Brianna exhibited a rash. Therefore, the heeding presumption was not particularly relevant. There is no error here.

■ Next, McNeil argues that the trial court erred in giving a "concurring causes" instruction.

A defective product substantially contributes to a plaintiff's injuries if it is sufficient to cause them or when combined with other contributing factors is sufficient to cause them, even though each alone would have been insufficient. A defendant will not be permitted to avoid responsibility for the injurious consequences of its defective product merely because a defective product of another would have independently caused the same result. The law on this type of substantial contributing factor is aptly set out in the Pennsylvania Suggested Standard Jury Instructions:

> When negligent conduct of two or more persons contributes concurrently to an occurrence or incident, each of these persons is fully responsible for the harm suffered by the plaintiff regardless of the relative extent to which each contributed to the harm. A cause is concurrent if it was operative at the moment of the incident, and acted with another cause as a substantial contributive factor in bringing about the harm.

Pa. SSJI Civ. 3.26 Concurring Causes (Subcommittee Draft 1978). While this section applies to the negligent conduct of two or more persons, its reasoning applies just as forcibly to the defective products of two or more manufacturers.

*Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 215–216 (1991), *appeal denied*, 530 Pa. 644, 607 A.2d 254 (1992) (Olszewski, J. concurring).

Instantly, there was testimony that something other than Children's Motrin, *e.g.*, Pediazole, may have contributed to Brianna's development of SJS/TEN. Dr. Stern testified that an infectious illness or the sulfisoxazole component in Pediazole were responsible for Brianna's SJS which evolved into TEN. (Notes of testimony, 5/3/11, p.m. session at 41, 52.) However, Dr. Stern could not exclude the possibility that Children's Motrin and Pediazole both contributed to Brianna's SJS/TEN. (Notes of testimony, 5/11/11, p.m. session at 59–60.) Therefore, the jury could have reasonably concluded that OTC Children's Motrin and some other agent, *e.g.*, the antibiotic Pediazole, combined to cause Brianna's illness. The trial court did not err in giving the concurrent causes jury instruction.

■■■■ Next, McNeil argues that the trial court gave an incorrect jury instruction. McNeil claims that it asked for an instruction to the effect that the jury could not consider drugs other than ibuprofen, or the conduct of other drug manufacturers, in arriving at a verdict. McNeil's request was granted over the plaintiffs' objection. (McNeil's brief at 47.) During the jury charge, the trial court issued the following instruction:

> You heard reference to drugs other than ibuprofen that were removed from the market. There is a word missing. I'm trying to figure out what the word is here. Okay. You may have heard reference to drugs other than ibuprofen that were removed from the market, or information that may have been reported to companies other than McNeil. You may consider the conduct of other pharmaceutical manufacturers, or what happened with other drugs, such as other drugs being taken off the market, when evaluating the defendant's conduct.

Notes of testimony, 5/19/11, a.m. session at 41–42.

McNeil claims that the trial judge forgot to include the word "not," *i.e.*, the instruction should have read, "You may *not* con-

sider the conduct of other pharmaceutical manufacturers . . ." (emphasis added). Although the trial court claims it gave the requested instruction verbatim, there is support for McNeil's contention in the record. (Trial court opinion, 1/7/13 at 109.) At sidebar following the jury charge, McNeil twice took exception to the charge as given. (Notes of testimony, 5/19/11, a.m. session at 69, 73.) Defense counsel stated, "Our 41 asserted that the jury should be instructed that they could not decide the case based on the conduct of other pharmaceutical companies or other drugs being taken off the market; and I think the opposite is what was given." (*Id.* at 73.) Nevertheless, the trial court declined to correct the instruction. (*Id.* at 75.)

The trial court's insistence that it read the instruction exactly as submitted by McNeil makes no sense in light of defense counsel's objections and the fact that the instruction, as given, operates against McNeil. Why would McNeil ask the trial court to instruct the jury that they can consider the conduct of other drug manufacturers, or what happened with other drugs besides ibuprofen, such as drugs being pulled off the market, when evaluating McNeil's conduct in this case?

Ultimately, however, the issue does not compel a new trial because McNeil was not prejudiced by the trial court's alleged mistake. As appellees point out, the instruction really only pertains to their claims for negligent design defect and punitive damages, both of which the jury resolved in favor of McNeil. (Appellees' brief at 44.) The other drugs/other manufacturers instruction was not relevant to the failure to warn claim. Therefore, at best, it was harmless error.

▮ Next, McNeil argues that it is entitled to a new trial based on a number of erroneous evidentiary rulings. First, McNeil claims that the trial court erred by admitting evidence of risks associated with ibuprofen other than SJS/TEN, *e.g.,* liver toxicity and gastrointestinal bleeding. (McNeil's brief at 50.) According to McNeil, such evidence was irrelevant and inflammatory. However, evidence of other known risks and/or adverse effects of Children's Motrin other than SJS/TEN was relevant to plaintiffs' negligent design defect claim. This evidence went to plaintiffs' argument that OTC Children's Motrin was a defective product. The evidence was also relevant to prove punitive damages, that McNeil had knowledge of other adverse reactions and side effects and failed to warn consumers. (Trial court opinion, 1/7/13 at 80–81.)

▮ McNeil also argues that the trial court erred in allowing post–2000 evidence including adverse event reports ("AERs"). AERs are reports submitted to the FDA after the manufacturer of a drug has received a report indicating that an individual using the drug has experienced an adverse event. McNeil argues that these AERs related to events that occurred after Brianna's injuries and distorted the jury's analysis of whether McNeil was negligent in November 2000 and whether that negligence caused Brianna's injuries. (McNeil's brief at 51–52.) However, the trial court specifically instructed the jury that they were not to consider the AERs as evidence of causation, only notice. (Trial court opinion, 1/7/13 at 85, citing notes of testimony, 5/19/11, a.m. session at 25.) The jury was instructed that the AERs were admitted for the limited purpose of proving that McNeil had notice of the reports. (*Id.*) Furthermore, the evidence was relevant to plaintiffs' punitive damages claim and to prove the feasibility in

2000 of adequate warnings which were eventually instituted in 2005.

Next, McNeil contends that the trial court improperly allowed plaintiffs to present evidence regarding possible warnings that the FDA actually rejected, including references to SJS, TEN, or "life-threatening" diseases or reactions in the OTC Children's Motrin label. (McNeil's brief at 52.) However, as McNeil concedes, the trial court instructed the jury on this issue:

> As a matter of law, you can not find the defendant is liable for failure to give warnings or instructions that the FDA has considered and rejected, or for failing to give warnings that there is clear evidence that the FDA would have rejected. Defendant McNeil contends that the FDA has considered and rejected revised labeling for over-the-counter Children's Motrin that would include reference to SJS or TENS, or that would have warned of, quote, "life-threatening disease" and reaction. Therefore, if you accept defendant's contentions, then you cannot find that the defendant is liable for the failure to provide adequate warnings because they did not include in labeling for over-the-counter Children's Motrin reference to SJS or TENS, or a warning referencing the life-threatening diseases or reactions.

Notes of testimony, 5/19/11, a.m. session at 45–46. "The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown*, 567 Pa. 272, 786 A.2d 961, 971 (2001), *cert. denied*, 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003) (citations omitted). There is no merit to McNeil's argument in this regard.

Next, McNeil argues that the trial court erred in allowing evidence regarding advertisements which Mrs. Maya may or may not have seen, and upon which she did not rely in administering OTC Children's Motrin to Brianna. (McNeil's brief at 53.) The trial court granted McNeil's pre-trial motion *in limine* seeking to exclude evidence of any advertisements which plaintiffs did not actually review; however, at trial, the trial court allowed Mrs. Maya to be questioned regarding an advertisement from Pediatrics in January 1996, the year before Brianna was born. The advertisement claimed that "No pediatric antipyretic/analgesic is more effective," and that "Children's TYLENOL has a superior safety profile to ibuprofen." (Plaintiffs' Exhibit 4510.10a.) Mrs. Maya was asked whether, if she had known that the company that makes both Motrin and Tylenol was advertising that Tylenol has a superior safety profile, it would have changed anything. (Notes of testimony, 4/21/11, p.m. session at 76–77.) Over objection, Mrs. Maya answered that she would have asked Dr. Brewer about it when she first recommended at Brianna's 18–month well baby exam to start alternating Tylenol with Motrin when she got a high fever. (*Id.* at 77–78.) Mrs. Maya was also asked whether an advertisement stating that, "no pediatric medicine is more effective than Tylenol" would have changed her conduct; Mrs. Maya replied that if she had seen the advertisement, she would have consulted Dr. Brewer about it. (*Id.* at 78.)

The trial court acknowledges that the admission of this evidence was contrary to its earlier pre-trial ruling on McNeil's motion *in limine*. Mrs. Maya testified that while she was familiar with the magazine Pediatrics, she did not recall having seen the advertisement. (*Id.* at 74–76.) Nevertheless, even if permitting this line of questioning was error, McNeil was not prejudiced. Mrs. Maya testified only that

if she had known Tylenol was advertised as being just as effective as Motrin but with a superior safety profile, by a company which manufactured both drugs, she would have asked Dr. Brewer about it. As the trial court remarks, it is unknown what Dr. Brewer would have said or if any additional information provided by Dr. Brewer would have changed Mrs. Maya's decision to administer Children's Motrin to Brianna. (Trial court opinion, 1/7/13 at 82–83.)

■■■ Next, McNeil asserts that the trial court erred by permitting evidence of "foreign regulatory matters." For example, Brianna's treating gynecologist, Steven Pliskow, M.D., testified regarding the filing of a Citizen's Petition with the FDA, of which he was a co-signer:

> In addition, "I felt that it wasn't fair that patients in our country weren't receiving—"; and, "the issues were clear to me from reading it that patients—patients and physicians weren't being warned, and that patients in this country weren't receiving the warnings that patients in other countries were receiving. So it wasn't fair."

Notes of testimony, 4/5/11, a.m. session at 39–41. McNeil also complains that during questioning of a witness, plaintiffs' counsel made reference to Oxyphenbutazone having been withdrawn in foreign countries:

> It says, "Drug-induced TEN is a feared but rare adverse reaction with a case fatality rate as high as 25 percent." It goes on to say, "During the period up to 1984 serious skin disorders were reported most frequently with Oxyphenbutazone, which has been withdrawn." I'm not going to continue reading that be-

cause it talks about it being withdrawn in places other than America, and Her Honor told us to stay in America. But it says "Was withdrawn." Then let me show you a document that shows it was withdrawn in America.

Notes of testimony, 4/19/11, a.m. session at 66.[7]

First, as appellees correctly observe, Dr. Pliskow never explained the substance of the warnings in other countries or how they materially differed from the warnings on American labels; only that he felt it was unfair American patients did not receive the identical warnings. (Appellees' brief at 48.) Second, it is axiomatic that statements or questions by counsel are not evidence and the jury was so instructed. (*See* notes of testimony, 5/19/11, a.m. session at 10 ("Remember, the questions asked by the attorneys and the comments made by them are not evidence.").) In addition, plaintiffs' counsel went on to acknowledge that the drug in question was also withdrawn in America. It is difficult to see how McNeil was prejudiced by that statement.

Moreover, the trial court specifically instructed the jury to disregard evidence of other drugs being removed from foreign markets:

> ... ladies and gentlemen, any evidence or any testimony or any questions that regard drugs that were taken off the market anywhere outside of the United States is not relevant to this case. The FDA does not control anything that happens outside of its border so, therefore, anything that any other country does is not of relevancy in this case. Okay. So disregard any testimony with regards to that.

---

**7.** McNeil's objections to the above statements     were overruled.

Notes of testimony, 4/15/11, p.m. session at 123. Again, juries are presumed to follow the court's instructions. *Brown, supra.*

■ Finally, McNeil argues that plaintiffs' counsel's *misconduct* demands a new trial. McNeil claims that counsel repeatedly disregarded the trial court's rulings and impermissibly referenced McNeil's wealth and its "army of attorneys." McNeil argues that plaintiffs' counsel persistently referred to McNeil's size and the number of lawyers at its disposal, framing the case as a "David and Goliath" battle. (McNeil's brief at 55.) McNeil contends that plaintiffs' counsel repeatedly asked "loaded questions" of witnesses suggesting that the FDA lacked sufficient resources to adequately monitor drug safety, despite the trial court sustaining McNeil's objections. (*Id.* at 57.) According to McNeil, counsel purposely inflamed the passions of the jury to the point where they were unable to render a fair and just verdict. (*Id.* at 55–58.)

> Our standard of review regarding a trial court's denial of a motion for a new trial is limited. The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law which controls the outcome of the case.

*Siegal v. Stefanyszyn,* 718 A.2d 1274, 1275 (Pa.Super.1998), *appeal denied,* 559 Pa. 693, 739 A.2d 1059 (1999), citing *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1 (1994).

> Whether remarks by counsel warrant a new trial requires a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect. *Martin v. Philadelphia Suburban*

*Transportation Co.,* 435 Pa. 391, 257 A.2d 535, (1969). It is the duty of the trial judge to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to. *Millen v. Miller,* 224 Pa.Super. 569, 308 A.2d 115 (Pa.Super.1973). However, there are certain instances where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate the taint. *Dannals v. Sylvania Township,* 255 Pa. 156, 99 A. 475 (1916) (Counsel characterized defense witness as a "drunkard" from the "slums"). *Saxton v. Pittsburg Railways,* 219 Pa. 492, 68 A. 1022 (1908) (Counsel had argued that defendant had suppressed evidence when there was no evidence of this fact).

*Id.* at 1277.

The trial court noted that, "an exorbitant amount of patience was required to control *all* counsel throughout the entire trial," not just plaintiffs' counsel. (Trial court opinion, 1/7/13 at 50 (emphasis in original).) The trial court found that the alleged misconduct did not prevent the jury from sifting through the evidence objectively and returning a verdict that was supported by the evidence presented. (*Id.* at 50–51.) We observe that the jury found in McNeil's favor on two of the three claims, including punitive damages, despite plaintiffs' counsel's references to McNeil's size and assets. This would seem to indicate the jury's verdict was not the product of passion or prejudice. The trial court, which presided over this nine-week trial and observed the actions of all counsel, has thoroughly examined each allegation of misconduct and determined that a new trial was not warranted. (*Id.* at 50–75.) We agree and adopt the trial court's analysis in this regard. The trial court did not

abuse its discretion in denying McNeil's motion for a new trial.

Having determined that McNeil's issues on appeal are without merit and do not afford it any relief, we will affirm the judgment. The appeal at No. 3259 EDA 2011 is dismissed.

Order entering judgment affirmed.