J-A04024-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.M. ON BEHALF OF I.M., A MINOR, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| P.L., | : | |
| | : | |
| Appellant | : | No. 2710 EDA 2019 |

Appeal from the Order Entered September 6, 2019
in the Court of Common Pleas of Bucks County
Civil Division at No(s): No. 2019-61270-A-37

BEFORE:  PANELLA, P.J., STRASSBURGER, J.* and COLINS, J.*

MEMORANDUM BY STRASSBURGER, J.:          **FILED MARCH 27, 2020**

Appellant, P.L. (Stepfather), appeals from the order granting a final Protection from Abuse (PFA) order pursuant to the PFA Act, 23 Pa.C.S. §§ 6101-6122, in response to the petition filed by K.M. (Father), on behalf of I.M., Father's minor child born in May 2007.  We affirm.

By way of background, I.M., who was twelve years old when Father filed the PFA petition, is the daughter of Father and C.L. (Mother).  I.M. has three siblings: her twin brother, R.M., and her fifteen-year-old twin brothers, D.M. and C.M. (collectively, Children).  Father and Mother are divorced from each other; both have since remarried.  Mother is married to Stepfather.  Mother has primary physical custody of Children, and Children, Mother, and Stepfather reside together in New Jersey.  Father and his wife reside together

_____
* Retired Senior Judge assigned to the Superior Court.

in Bucks County, Pennsylvania. Father exercised his custody every Wednesday night for dinner, and on weekends.

On July 10, 2019, I.M. disclosed to Father that Stepfather had been inappropriately touching her. Father filed a PFA petition on I.M.'s behalf against Mother on July 12, 2019.[1] In that petition, he averred that he was informed by Children that Stepfather had been "sexually molesting" I.M. "for approximately the past year;" specifically, Father was told that Stepfather "would act like he was giving [I.M.] a backrub and then would touch her breasts and buttocks under her clothing." Petition for Protection from Abuse, 7/12/2019. Father further stated his belief that Mother was aware of the molestation based upon her reaction to learning about I.M.'s accusations. *Id.* On July 17, 2019, Father filed a PFA petition on I.M.'s behalf against Stepfather. The allegations were similar to those in the petition against Mother, except this time Father averred that Children had told him that Stepfather had been molesting I.M. "for approximately the past three years."

_____

[1] On July 12, 2019, Father also filed an emergency petition to modify Mother's custody, seeking sole legal and physical custody of Children primarily based on the same allegations he set forth in the PFA petition. At the time of the PFA hearing, the custody matter remained pending. Despite the pending custody matter, the PFA order in Stepfather's case is a final order for purposes of Pa.R.A.P. 341 because the custody matter between Father and Mother remained a separate matter from the PFA matter, despite some overlap of the subject matter.

Petition for Protection from Abuse, 7/17/2019. The PFA court granted both petitions and entered temporary PFA orders.[2]

After continuances, the PFA court conducted a hearing regarding the petitions on August 21 and 23, 2019. At the hearing, I.M. testified that on multiple occasions, when Stepfather came into her room to say goodnight, he asked to rub her back. I.M. acquiesced, but she said Stepfather took it further by "go[ing] down to my butt and then turn[ing] me over and go[ing] to my breasts." N.T., 8/21/2019, at 26. I.M. testified that this touching occurred under her clothes. *Id.* It happened "[a]bout once a month" since they moved to Cherry Hill, New Jersey in 2013. *Id.* at 26, 28, 33.

I.M. said she did not tell Mother because she felt "uncomfortable," and she initially did not tell Father because she was afraid of what Stepfather would do once he found out she told someone. *Id.* at 26-27. I.M. sometimes went to her room to avoid Stepfather. *Id.* at 29. She also has hid in a closet when he got angry and yelled at her. *Id.* I.M. believed Mother knew Stepfather was entering I.M.'s room at night because Mother would see him enter, although Mother was never present during the backrubs. *Id.* at 27.

---

[2] Both the police and DHS investigated the allegations. At the time of the hearing, no charges had been filed, and Father was not sure if their investigation was still ongoing. *Id.* at 114-15. DHS's investigation was still ongoing. *Id.* at 10-14. DHS did not have a safety plan in place because Children were residing with Father in Pennsylvania, but "probably" would institute one if Children returned to the home of Mother and Stepfather in New Jersey. *Id.*

I.M.'s twin R.M. confirmed during his testimony that Stepfather came into the room that I.M. and R.M. shared and gave I.M. backrubs on the top bunk while R.M. was on the bottom bunk. N.T., 8/21/2019, at 58. From his vantage point, all R.M. could see was Stepfather "go[ing] up [I.M.'s] back." *Id.* When asked how often Stepfather came into the room, R.M. responded, "It's not really that often but in spans of weeks of four times a week." *Id.* I.M. told R.M. about the abuse on the same night she told Father. *Id.* at 62. According to R.M., she told him that Stepfather was touching her "inappropriately" outside[3] of her clothes on the "breast and butt." *Id.* at 62-63. She did not tell him how long it had gone on, except she said it had not happened in about a year. *Id.* at 62.

I.M.'s fifteen-year-old brother C.M. also testified. He has observed Stepfather entering I.M.'s room on various occasions, and he estimated that three times he saw Stepfather rubbing I.M.'s back while I.M. was on the top bunk bed in her room and Stepfather was standing on the floor. *Id.* at 74, 94. C.M. found out about the abuse when he overheard I.M. telling her friend that Stepfather gave her backrubs and she did not like it. *Id.* at 69-70. C.M. told I.M. that Stepfather touched his back all of the time. *Id.* at 95. In response, I.M. said, "no, it got worse," and told C.M. that Stepfather had been touching her "butt" and her "private parts," and pointed down to her vagina. *Id.* at 86, 95. She did not specify whether it occurred in or outside of her

---

[3] This differed from I.M.'s account during her testimony.

clothing. *Id.* at 87. After learning about Stepfather's abuse, C.M. made I.M. tell Father when he dropped them off after dinner on July 10, 2019. *Id.* at 83-84.

During Father's testimony, Father provided more details about the conversation he had with I.M. and C.M. on July 10, 2019. Father had driven Children back to Mother's residence following his weekly Wednesday dinner visit. D.M., R.M., and I.M. exited the car, but C.M. stayed behind and told Father that I.M. had to tell him something and Father should encourage her to tell him if she was reluctant. *Id.* at 111. I.M. returned to the car, and after I.M. was reluctant to tell Father, C.M. told him. *Id.* at 112. Father asked I.M. to confirm that what C.M. said was true and asked her for more details. *Id.* at 112-13.

Since Mother's custody period had resumed, Father was not sure what his legal rights were, so he told C.M. to make sure Stepfather did not enter I.M.'s room that night. *Id.* at 113. After consulting with his police-officer brother and his lawyer, he picked up Children the next day, and thereafter filed a police report, the PFA petitions, and the emergency custody petition. *Id.* at 113-14. On cross-examination, Father stated that the reason he put a different time frame for the duration of the abuse (*i.e.*, one year in Mother's PFA petition versus three years in Stepfather's PFA petition) was that he received more information from Children between the filing of the two petitions and "[t]hey are children." *Id.* at 132.

- 5 -

Mother testified that she was aware that Stepfather gave I.M. backrubs, but the occasional ones she observed Stepfather give I.M. in the kitchen were "benign." *Id.* at 103. Mother never went into I.M.'s bedroom with Stepfather. *Id.* When asked if she found it to be unusual or improper for Stepfather to go into I.M.'s room to give I.M. backrubs, Mother responded, "no." *Id.* at 104.

The PFA court also heard from Stepfather. He admitted that he had given I.M. backrubs for "[m]any years" in her room as part of his goodnight routine, but denied touching her "private parts," breasts, buttocks, or vagina. N.T., 8/23/2019, at 158-56, 163. He would touch the "small of the back all the way up to the shoulders and then back of the neck." *Id.* at 158. According to Stepfather, I.M. was always clothed, and he stood on the floor next to the bunk bed and reached over the railing to rub I.M. while she lay on the top bunk. *Id.* at 162. R.M. was on the bottom bunk when he gave I.M. a backrub. *Id.* Stepfather claimed he sometimes gave R.M. backrubs too. *Id.* at 163. Stepfather gave his two children and Mother's four Children backrubs because when he was growing up, his parents gave backrubs to him and he enjoyed it. *Id.* at 159.

At the conclusion of the hearing, the PFA court commented that the case came down to whether it believed I.M. or Stepfather, and stated that it believed I.M. *Id.* at 224. It further elaborated that none of the inconsistencies pointed out by Stepfather's counsel convinced the court that anyone was being untruthful, particularly because children were involved. *Id.* The PFA court

found based on the evidence that "there's something untoward happening to [I.M.]," and "that the, quote, backrubs are being given in the young lady's bedroom where no one else can see what is happening and that she's the only one getting backrubs in her bedroom," which PFA court characterized as "very troubling." *Id.* at 224-26. Accordingly, the PFA court entered a one-year PFA order prohibiting Stepfather from having any contact with I.M.[4]

Stepfather timely filed a notice of appeal. The PFA court ordered Stepfather to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).[5] Stepfather complied, but his concise statement listed 27 issues. The PFA court submitted a Rule 1925(a) opinion, which addressed the merits, but also urged us to find waiver based upon the redundancy of the issues Stepfather presented in his concise statement.

Thus, we turn to Rule 1925 and our caselaw to determine whether Stepfather has waived all issues for appeal based upon a deficient concise

_____

[4] It denied the PFA petition as to Mother, finding there was not enough evidence to determine that Mother was violating the law. It also denied both petitions as to I.M.'s brothers, except it added a provision that Mother and Stepfather may not question or speak to Children as to the incidents in the case, particularly because there are ongoing investigations into Stepfather's conduct. Through the PFA against Stepfather, the trial court awarded sole legal and primary physical custody of I.M. to Father, and permitted Mother to exercise partial physical custody of I.M. at a maternal aunt's house without Stepfather present. Stepfather filed a motion for reconsideration of the portion of the order relating to I.M.'s brothers, and the trial court entered an amended order with clarification of these provisions on September 5, 2019.
[5] Because the PFA order also addressed custody of I.M., this Court designated this case as a children's fast track appeal subsequent to the filing of the notice of appeal.

statement. Timely filing of a response to a trial court's Rule 1925(b) order is not enough to preserve issues for appeal. ***Jiricko v. Geico Ins. Co.***, 947 A.2d 206, 210 (Pa. Super. 2008). Rule 1925 requires an appellant to "set forth only those rulings or errors that the appellant intends to challenge," Pa.R.A.P. 1925(b)(4)(i), and the statement "should not be redundant…." Pa.R.A.P. 1925(b)(4)(iv). "Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors will not alone be grounds for finding waiver." ***Id.*** However, if an appellant fails to set forth a sufficiently "concise" and "coherent" statement in circumstances that suggest bad faith, waiver of all issues may result. ***Jiricko***, 947 A.2d at 210. ***See also Mahonski v. Engel***, 145 A.3d 175, 182 (Pa. Super. 2016) (deeming all claims waived when appellants filed a voluminous Rule 1925(b) statement with 87 issues under circumstances suggesting bad faith in a straightforward contract action); ***Maya v. Johnson & Johnson***, 97 A.3d 1203, 1211 n.4 (Pa. Super. 2014) (suggesting that courts should consider the complexity of the lawsuit, the size of the record, and evidence of bad faith or an attempt to thwart the appellate process when deciding waiver issues pursuant to Pa.R.A.P. 1925(b)).

We agree with the PFA court that Appellant's concise statement is redundant and not actually concise. Yet we are not convinced that Appellant acted in bad faith as opposed to drafting the statement inartfully and not fully comprehending our appellate rules. For example, 21 out of 27 issues attempt

to paint a picture from every possible angle that I.M.'s testimony was not credible, despite Rule 1925's prohibition against lengthy explanations and specification that subsidiary issues are included within the main issue. We remind Appellant's counsel that the point of Rule 1925 is to winnow down the issues for appeal, but decline to dismiss Appellant's appeal based upon the concise statement. **See Morris v. DiPaolo**, 930 A.2d 500, 503 (Pa. Super. 2007) (declining to exercise this Court's discretion to dismiss all appellate issues based upon concise statement that purportedly raised 29 issues; statement actually raised far fewer issues, and this Court characterized the redundant nature as a reflection of drafting that was "clearly inartful" but "not intentionally subver[sive]" of "the intent of the Rules of Appellate Procedure").

In contrast to his concise statement, Stepfather presents only one broad substantive issue on appeal: "Whether the [PFA] court abused its discretion and/or committed an error of law by entering a final protection from abuse order." Stepfather's Brief at 3 (trial court response and unnecessary capitalization omitted). As we explain *infra*, although phrased broadly, what Stepfather specifically is challenging is the PFA court's decision to credit I.M.'s testimony instead of his.

"Our standard of review for PFA orders is well settled. 'In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.'" **Boykai v. Young**, 83 A.3d 1043, 1045 (Pa. Super.

2014) (quoting *Stamus v. Dutcavich*, 938 A.2d 1098, 1100 (Pa. Super. 2007)).

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa. Super. 2019) (citation omitted).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *H.M.H. on behalf of L.M.H. v. D.J.G.*, 210 A.3d 1045, 1049 (Pa. Super. 2019). The definition of abuse in the PFA Act includes sexual abuse of minor children by a "family or household member[]" such as a step-parent. *See* 23 Pa.C.S. § 6102(a); *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012).

"The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." *K.B.*, 208 A.3d at 128 (citation and brackets omitted). A "preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, [enough] to tip a scale slightly." *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004).

Stepfather's brief does not clearly delineate whether he is attempting to present a challenge to the sufficiency of the evidence or a challenge to the weight of the evidence. *See* Stepfather's Brief at 59. Although Stepfather argues that Father failed to meet his burden of proof and the PFA court's findings were not supported by competent evidence, thereby suggesting a sufficiency challenge, the majority of his argument section is spent assailing the credibility of I.M. and the weight the PFA court gave to certain evidence. *See id.* at 59-74.

Specifically, Stepfather argues that there was no corroborating evidence of the abuse, and Stepfather denied doing anything other than rubbing I.M.'s back. He criticizes the PFA court for only focusing on I.M.'s testimony and discounting any contradictory testimony from other witnesses. In Stepfather's view, the PFA court should not have credited I.M.'s testimony because it was both internally inconsistent and contrary to the averments in Father's petitions and the testimony of Father, R.M., and C.M., at least as to their recounting of the substance and timing of I.M.'s disclosures to them. Stepfather insinuates that these differences in testimony occurred because I.M., R.M., C.M., and Father fabricated the story of abuse in order to help Father gain custody of Children. Stepfather emphasizes the fact that I.M. did not disclose the abuse until after Children decided they wanted to live at Father's house, plus Father permitted I.M. to return to the house of Mother and Stepfather after learning

of the disclosures. Stepfather also claims that during her testimony, I.M. admitted that she made the allegations to help Father gain custody.

Stepfather's complaints about I.M.'s credibility do not stop there. He asserts that I.M.'s version should not be credited because she did not protest the abuse while Stepfather was committing it, and she did not tell anyone about the abuse for years, including her best friends, Mother, or a custody evaluator who interviewed her one-on-one in 2016, in relation to a custody complaint filed by Father.[6] Stepfather also questions I.M.'s allegations because third parties did not detect any abuse, including (1) the custody evaluator, who expressed his belief in 2016 that abuse was not a factor as to Mother and Father when assessing who should have custody; (2) the New Jersey Division of Child Protection and Permanency, which investigated the family in 2017[7] and did not put a safety plan in place; (3) Father, who has some experience researching and developing sexual assault protection and self-defense programs as part of his job; and (4) R.M., who was present in the room when Stepfather gave I.M. backrubs. Furthermore, Stepfather contends the PFA court should not have believed I.M. because (1) in 2016,

---

[6] Father had filed an emergency petition for custody in 2016 after Stepfather's adult son moved back into Stepfather's house. Stepfather's son had sexually molested I.M. when he was a teenager and she was three years old. Father and Mother eventually resolved the dispute through a stipulated custody order.

[7] The record does not reveal why the agency investigated in 2017. *See* N.T., 8/21/2019, at 22.

- 12 -

the custody evaluator noted that Father called her "a skilled manipulator" and C.M. called her "the devil in the flesh"; and (2) I.M. had stolen change from Stepfather's dresser the same day she disclosed the abuse to Father, and I.M. tried to lie about it to Stepfather until he told her his surveillance cameras had captured the event. *Id.* at 72-73.

To the extent that Stepfather challenges the sufficiency of the evidence, his argument fails. It is of no moment that he denied the allegations of abuse and that no one else observed the abusive acts; "[t]he petitioner's testimony is sufficient if it is believed by the trial court." *Custer v. Cochran*, 933 A.2d 1050, 1058 (Pa. Super. 2007) (*en banc*). The PFA court explicitly found I.M.'s testimony as to Stepfather's abuse to be credible and completely rejected Stepfather's denials of abuse. PFA Court Opinion, 10/21/2019, at 12-13. The PFA court determined I.M. was being truthful when she testified that Stepfather touched her breasts and buttocks during the backrubs, and she consistently maintained over the course of multiple questions during testimony that the abuse had occurred for the last four or five years but had stopped for one year when she started rejecting the backrubs. *Id.* at 11-12. Given the fact that the evidence indicates that no one, even R.M., could see what was happening in the top bunk in I.M.'s room during Stepfather's backrubs, the PFA court properly focused on assessing the credibility of the testimony of I.M. versus Stepfather. I.M.'s testimony, without corroboration,

is sufficient to establish that Stepfather abused I.M. within the meaning of the PFA Act.

Furthermore, to the extent Stepfather contends the PFA court abused its discretion by believing I.M. over Stepfather and reconciling any discrepancies in the testimony in I.M.'s favor, his arguments fail.

The PFA court was not persuaded by Stepfather's testimony as to the benign nature of the backrubs since they occurred at night in I.M.'s bedroom with no one able to see what he was doing. Furthermore, the PFA court found it significant that "none of the other children received 'backrubs' in bed. I.M. alone was subject to this 'special treatment.'" PFA Court Opinion at 10/21/2019, 12-13.[8]

The PFA court discounted any inconsistencies pointed out by Stepfather as the result of Children's young ages and nervousness on the stand, particularly in front of Stepfather, who appeared to be controlling based upon his placement of surveillance cameras throughout the house and daily monitoring of them. *Id.* at 12-13. The PFA court also noted that C.M. and R.M. were relying upon secondhand information from I.M., and neither of them

---

[8] C.M. testified Stepfather touched his back, but never averred that it was at night in bed where no one else could see it. R.M. was not asked whether he had received backrubs. Although Stepfather testified he gave other Children backrubs, it is unclear where he claims such backrubs occurred. Even if Stepfather's testimony can be construed as an assertion that he gave R.M.'s backrubs in bed, it is clear that the PFA Court did not believe him.

was an eyewitness, including R.M., who did not have a clear vantage point of the entirety of what was going on in the top bunk. ***Id.***

The PFA court was not persuaded by Stepfather's attacks on I.M.'s credibility based upon her failure to disclose the abuse for some time, noting that it "is incredibly common for these types of situations to go unreported for years where there is an unequal power dynamic in the relationship. Adults have a hard enough time reporting sexual abuse, let alone a child who is twelve years old." ***Id.*** The PFA court also rejected Stepfather's interpretation of I.M.'s testimony that she did not tell Father about the abuse prior to when she did because she concocted this story to aid Father's custody case. In the PFA court's view, I.M.'s statement during cross-examination that she did not tell Father initially because "we were already going, trying to get custody and I knew that would help," meant that "she [had been hoping] Father would get custody of her and therefore the abuse would stop without her ever having to tell anyone of it." ***Id.***

We discern no abuse of discretion in the PFA court's findings and credibility determinations. Despite acknowledging in his brief that assessing the credibility of witnesses is exclusively within the PFA court's domain, Stepfather's Brief at 57-58, Stepfather nevertheless persists on appeal in "attempt[ing] to re-litigate the facts and the PFA court's credibility findings." ***C.H.L. v. W.D.L.***, 214 A.3d 1272, 1276 (Pa. Super. 2019). However, as an appellate court, "we defer to the trial court's credibility determinations, and

we are not entitled to re-weigh the evidence." **K.B.**, 208 A.3d at 130; **see also C.H.L.**, 214 A.3d at 1276-77 ("[T]he credibility of witnesses and the weight to be accorded to their testimony is within the **exclusive** province of the trial court as the fact finder." (emphasis added)). Even if we were persuaded by Stepfather's arguments, which we are not, all of the PFA court's findings are supported by testimony in the record. Because there is ample support in the record for the PFA court's credibility findings, we may not and do not overturn those findings. **In re Merlo,** 58 A.3d 1, 16 (Pa. 2012). Accordingly, we affirm the PFA court's order.

Order affirmed.

Judgment Entered.

JosephD.Seletyn,Esq.
Prothonotary

Date: 3/27/2020