# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| AMEENA BROWN and EVAN BRAGGS, Individually and as Co-Administrators of the Estate of A.B., deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N20C-01-067 PAW |
| FISHER-PRICE, INC. and MATTEL, INC. | ) ) ) | |
| Defendants. | ) ) | |

Submitted: November 8, 2024
Decided: December 20, 2024

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Consideration of Defendants' Motion for Summary Judgment;*

**DENIED.**

Robert J. Leoni, Esquire, Shelsby & Leoni, PA, *Attorney for Plaintiffs.*

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., and Ryan Kingshill, Esq., of Potter Anderson & Corroon LLP, *Attorneys for Defendants*.

**WINSTON, J.**

## I.  INTRODUCTION

Plaintiffs Ameena Brown and Evan Braggs, ("Plaintiffs") filed a products liability action against Defendants Fisher-Price, Inc., and Mattel, Inc. ("Defendants") following the death of their infant son, A.B.  This decision addresses Defendants' summary judgment motion for lack of evidence demonstrating causation or in the alternative, partial summary judgment as to: (i) increased risk causation; (ii) rebreathing as a cause of death; (iii) strict liability; (iv) strict liability failure to warn; (v) negligent failure to warn; (vi) negligence due to selection of materials; (vii) duty to test; and (viii) conscious pain and suffering.

For the reasons set forth below, summary judgment and partial summary judgment is **DENIED**.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  THE ROCK N' PLAY SLEEPER

The Rock n' Play Sleeper ("RnP"), sold and marketed by Defendants, is an inclined sleep product designed for day use or overnight sleep where infants are placed in a supine position at an angle.[1]  The RnP was sold between 2009 and 2019.[2] The RnP included a free-standing metal rocking frame, a rigid plastic backing, a

---

[1] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. A at 2.
[2] Ans. Br. at 1.

removable seat pad with a fabric cover, and a three-point belt restraint system.[3] The

restraint system secured a strap between the infant's legs and across the torso.[4] The

RnP came unassembled in a box with an instruction manual when sold at retail.[5]

The instruction manual and the RnP included the following warning:

> "**WARNING**"
>
> **Failure to follow these warnings and the instructions could result in serious injury or death.**
> - ALWAYS use the restraint system.
> - ALWAYS use the pad provided, which includes the restraint. NEVER add a mattress, pillow, comforter, or padding.
> - SUFFOCATION HAZARD – Infants can suffocate:
>   - in gaps between an extra pad and the side of the product.
>   - on soft bedding.
> - FALL HAZARD – To prevent falls, DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs (11 kg), whichever comes first.
> - Strings can cause strangulation! NEVER place items with a string around a child's neck such as hood strings or pacifier cords. NEVER suspend strings over produce or attach strings to toys.
> - NEVER place product near a window where cords from blinds or drapes can strangle a child.
> - To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians recommend healthy infants be placed on their backs to sleep, unless otherwise advised by your physician.
> - Always provide the supervision necessary for the continued safety of your child.
> - When used for playing, never leave child unattended.[6]

---

[3] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. A at 2.

[4] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. A at 2.

[5] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. B at 2.

[6] Op. Br. at 4; Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. A at 3 and C; Ans. Br., Ex. HH.

At her deposition, Brown confirmed that the RnP she used included a warning label that looked similar to the one Defendants displayed.[7] In April 2019, Defendants issued a voluntary recall of the RnP and stated that "[i]nfant fatalities have occurred in the [RnP]."[8]

## B. A.B.'S DEATH

A.B. was born premature on February 12, 2017, at about twenty-five weeks.[9] A.B. was hospitalized for five months and sent home with oxygen to assist his breathing and a feeding tube to assist his swallowing.[10] A.B. was discharged home on July 6, 2017.[11] Brown and A.B. lived in a one-bedroom apartment.[12] Brown slept in the bedroom, and A.B. slept in the living room.[13] By October of 2017, A.B. no longer required supplemental oxygen.[14] The infant still used a feeding tube located in his left nostril full-time until his passing.[15]

---

[7] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 71:17-72:3.

[8] Ans. Br., Ex. A.

[9] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 17:13-14, 51:13-17 and Ex. F at 150:15-18; Ans. Br. Ex. Y at 2.

[10] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 53:5-25., 56:1-57:1-9, and 59:1-16.

[11] Ans. Br., Ex. Y at 3.

[12] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 89:13-15.

[13] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 89:7-18.

[14] Ans. Br., Ex. Y at 4.

[15] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 60:24-61:19, 106:21-24.

Brown received a second-hand RnP as a gift for A.B.[16] Brown would place A.B. in the RnP for naptime and overnight sleep.[17] At her deposition, Brown testified that she saw the RnP warning label on the device and read it aloud to Braggs, who also saw and read the label.[18] Brown also admitted that she did not always use the restraint system.[19] Brown placed A.B. in the RnP daily.[20]

On January 15, 2018, Brown fed A.B.; dressed him in a diaper, three "onesies," and two pairs of socks; swaddled him; and placed him supine in the RnP.[21] Brown did not use the RnP restraint system on A.B.[22] The following morning at approximately 6:00 a.m., Brown checked on A.B.[23] According to Brown's testimony, she noticed A.B. rolled over to his left side with his face pressed against

---

[16] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 67:1-68:15 and Ex. G at 75:1-8; Ans. Br. Ex. Y at 5.

[17] Ans. Br., Ex. Y at 5.

[18] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 68:23-69:1-16; Ex. H at 80:1-16.

[19] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 84:3-9.

[20] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 74:10-25.

[21] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. F at 103:1-13 and104:22-24; Ans. Br. at Ex. Y at 6.

[22] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 96:4-9.

[23] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 105:1; Ans. Br., Ex. Y at 6.

the side of the RnP.[24]  Brown touched A.B. and his body felt stiff.[25]  Brown then called her mother, Christine Singleton, a licensed nurse, who arrived at her apartment within a few minutes.[26]  Singleton then inspected A.B. and called 911.[27]  A.B. was later pronounced deceased.[28]  The medical examiner determined the cause of death to be Sudden Infant Death Syndrome ("SIDS").[29]  According to the medical examiner, Albert Chu, M.D., SIDS is "the death of an infant that remains unexplained after a complete investigation."[30]

## C.    THE INSTANT ACTION

Plaintiffs filed a wrongful death and survival action alleging negligence, breach of implied warranty of merchantability, breach of implied warranty of fitness

---

[24] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 106:2-12; Ans. Br., Ex. Y at 6.

[25] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 105:19-21; Ans. Br., Ex. Z at 105:19-21.

[26] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. G at 29:1-23; Ans. Br. Ex. Y at 7.

[27] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. E at 109:3-12; Ans. Br., Ex. Y at 7.

[28] Ans. Br., Ex. Y at 7.

[29] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. F at 50-51; Ans. Br., Ex. AA at 53:8-24.

[30] Aff. of J. Wasson in Supp. of Defs.' Op. Br., Ex. F at 53:8-24; Ans. Br., Ex. AA at 53:8-24.

for a particular purpose, breach of express warranty, fraud, fraudulent concealment, strict liability, and negligent infliction of emotional distress (the "Complaint").[31]

On February 1, 2024, Defendants moved for summary judgment for lack of causation evidence, and partial summary judgment as to certain specific claims and particular theories of liability.[32] Defendants contemporaneously filed seven *Daubert* motions.[33] On March 1, 2024, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment and their Oppositions to Defendants' *Daubert* motions.[34] On April 4, 2024, Defendants filed their Reply Brief in Support of their Motion for Summary Judgment and *Daubert* motions.[35]

On June 25, 2024, this Court heard oral argument and granted summary judgment as to breach of express and implied warranty claims (Counts II, III, and IV), fraud and fraudulent concealment claims (Counts V and VI), and negligent

---

[31] Compl.

[32] Op. Br.

[33] Mot. to Exclude Expert Rep. of Erin Mannen, Ph.d; Mot. to Exclude Expert Rep. of Darlene Vasbinder-Calhoun, D.O.; Mot. to Exclude Expert Rep. of Wayne K. Ross, M.D.; Mot. to Exclude Expert Rep. of Benjamin Hoffman, M.D.; Mot. to Exclude Expert Rep. of Dennis Rosen, M.D.; Mot. to Exclude Expert Testimony Regarding Rebreathing; and Mot. to Exclude Expert Testimony of Conscious Pain and Suffering.

[34] Ans. Br. in Opp. to Def.'s Mot. for Summ. J.

[35] Reply Br. in Support of Def.s' Mot. for Summ. J.

infliction of emotional distress (Count VIII).[36] At argument, the Court requested supplemental briefing on (1) the impact of *Tincher v. Omega Flex*[37] on Defendants' argument as to Plaintiffs' strict liability claim, and (2) the applicability of the doctrine of increased risk causation.[38] Plaintiffs filed their Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment on August 7, 2024.[39] Defendants filed their responsive supplemental brief on September 6, 2024.[40]

The remaining summary judgment claims are negligence and strict liability. The remaining issues for the Court to consider under these claims are causation, increased risk causation, rebreathing, strict liability, strict liability duty to warn, negligent duty to warn, selection of materials used in the RnP, duty to test, and conscious pain and suffering.

---

[36] Plaintiffs are no longer pursuing Counts II, III, IV, V, and VI. *See* D.I. 193. *See also* Tr., Oral Argument C.A. No. N20C-01-067 PAW, at 160:6-11. The transcript states negligent infliction of emotional distress is Count VII, but it is Count VIII. *See* Compl. ¶ 129.

[37] 104 A.3d 328 (Pa. 2014).

[38] Order on Suppl. Submissions Relating to Defs.' Mot. for Summ. J.

[39] Pls.' Suppl. Br.

[40] Defs.' Suppl. Br. Plaintiffs filed a letter to the Court on November 7, 2024, regarding the pending motion to exclude the testimony of Erin Mannen. D.I. 287. Defendants filed a letter in response on November 8, 2024. D.I. 290.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "when the record shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."[41] The moving party bears the burden of demonstrating the undisputed facts entitle it to judgment as a matter of law.[42] When the moving party sustains the initial burden of showing the nonexistence of any material issues of fact, the burden shifts to the non-moving party to substantiate its adverse claim by showing that there are material issues of fact in dispute.[43] If the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment.[44]

## IV. ANALYSIS

### A. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS FOR LACK OF EVIDENCE DEMONSTRATING CAUSATION.

Defendants seek summary judgment on Plaintiffs' claims of strict liability and partial summary judgment on negligence for lack of causation for reasons set forth

---

[41] Super. Ct. Civ. R. 56(c)).

[42] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[43] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) (citing *Moore*, 405 A.2d 679, 680).

[44] *Brzoska*, 668 A.2d at 1364 (citing *Wootten v. Kiger*, 226 A.2d 238 (Del. Super. 1967)).

9

in their contemporaneously filed *Daubert* motions.[45] Plaintiffs rely on their submissions in opposition to Defendants' *Daubert* motions, contending their experts offer opinions admissible under *Daubert*.[46] As set forth in the Court's Memorandum Opinions and Orders addressing Defendants' respective *Daubert* motions, Plaintiffs submit admissible causation expert testimony. Therefore, summary judgment is **DENIED** as to lack of causation evidence.

### 1.   INCREASED RISK CAUSATION

Next, Defendants move for partial summary judgment on Plaintiffs' experts' increased risk causation theories.[47] Defendants argue some of Plaintiffs' experts rely on an increased risk of harm as a means to establish causation which "has no application at all to this products liability case."[48] At oral argument and in their supplemental submission, Plaintiffs asserted their experts relied on both increased risk and direct causation and that increased risk is a mechanism used in Pennsylvania

---

[45] Reply Br. at 3.

[46] Ans. Br. at 17.

[47] Reply Br. at 4.

[48] Op. Br. at 12-13; Tr., Oral Argument C.A. No. N20C-01-067 PAW, at 13:19-14:10. Defendants argue increased risk causation has only been adopted by Pennsylvania in the context of Restatement (Second) of Torts § 323 to negligence claims in which services are rendered. Op. Br. at 12-13. Defendants cite to *In re Lipitor (Atorvastatin Calcium Mktg., Sales Practices & Prods. Liab. Litig*., 227 F.Supp. 3d 452, 469 (D.S.C. 2017)) and *Lempke v. Gen. Elec. Co*., 2012 WL 94547, at *4 (W.D. Pa. 2012) where both courts "declined to apply Section 323 to products liability case as Pennsylvania courts have not done so." Op. Br. at 13.

law that "furnishes a basis for the fact-finder to go further and conclude that [it] was [] a substantial factor."[49] Plaintiffs acknowledged that increased risk standing alone does not equal causation under Pennsylvania law as the jury must later decide whether the increased risk was a substantial factor in achieving causation.[50] After extensive argument, Defendants noted that they "understood [Plaintiffs'] counsel to be acknowledging that they were not trying to substitute increased risk for proof of causation."[51]

The function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to have the greater weight.[52] Rather, [her] function is to determine whether there is any evidence supporting a favorable conclusion to the nonmoving party.[53] Here, Defendants' argument rested on anticipating that Plaintiffs will use increased risk to prove causation; however,

---

[49] Tr., Oral Argument C.A. No. N20C-01-067 PAW, at 102:4-10 and 102:16-22; *see* Pls.' Suppl. Br. at 10.

[50] Pls' Suppl. Br. at 12; Tr., Oral Argument, C.A. No. N20C-01-067 PAW at 102:23-104:4. Plaintiffs further clarify that "[t]his increased risk argument is really an argument to the point of what will the jury instructions look like and what will the arguments look like to the jury, but it is absolutely a proper basis by which causation can be proved." *Id*. at 107:13-19.

[51] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 147:7-15.

[52] *Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969) (citing *Watson v. Shellhorn & Hill, Inc.*, 221 A.2d 506 (Del. 1966)).

[53] *Id*.

Defendants later recognized that Plaintiffs were not attempting to substitute increased risk for their burden to show factual causation.

At the summary judgment stage, this Court will not weigh the implication of increased risk as used in Plaintiffs' expert reports, and Defendants' initial argument is no longer in dispute. Accordingly, Defendants' argument is now **MOOT**, and they are not entitled to summary judgment on the issue of increased risk causation.

### 2. REBREATHING CLAIMS

Defendants move for summary judgment on Plaintiffs' claims that rebreathing carbon dioxide caused A.B.'s death.[54] Defendants' argument relies on those set forth in its contemporaneously filed *Daubert* motion seeking to exclude Plaintiffs' rebreathing testimony.[55] For the reasons set forth in the Court's Memorandum Opinion and Order addressing rebreathing, Defendants' Motion for Summary Judgment as to rebreathing is **DENIED**.

---

[54] Reply Br. at 21.

[55] Reply Br. at 21; *see* Defs.' Mot. To Exclude Pls.' Expert Test. Regarding Rebreathing.

**B.** **DEFENDANTS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT FOR STRICT LIABILITY.**

    **1.** **INTENDED USE**

Defendants assert Plaintiffs' strict liability claim must fail because Defendants can only be held liable for injuries resulting from the RnP's intended use. [56] Defendants posit Brown's failure to utilize the RnP's restraint system constituted an unintended use of the RnP, thus barring recovery. [57] Plaintiffs counter their failure to utilize the restraints qualifies as misuse, but still falls within the scope of the RnP's intended use. [58]

"[A] product is not defective so long as it is safe for its intended user." [59] "[A] plaintiff's misuse of a product cannot be grounds for granting summary judgment in favor of the manufacturer under a design defect theory unless it is established that

---

[56] Op. Br. at 13.

[57] Op. Br. at 14-15.

[58] Ans. Br. at 20-21. Plaintiffs also contend that *Tincher v. Omega Flex, Inc.* (Pa. 2014) reformulated Pennsylvania's law regarding strict liability "within the framework of design defect" and thus "put to bed the notion that a product's intended use" could have dispositive weight in a summary judgment context. Pls.' Suppl. Br. at 7. In *Tincher*, the Court considered the product's intended use as only one of several factors in their analysis of design defect and further held "…the test we articulate today is not intended as a rigid formula to be offered to the jury in all situations. The alternate theories of proof contour the notion of 'defective condition' in principled terms intended as comprehensive guidelines that are sufficiently malleable to account for product diversity and a variety of legal claims, products, and applications of theory." *See Tincher*, 628 Pa. at 429. Accordingly, the Court considers intended use as a factor in its analysis.

[59] *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1005 (Pa. 2003).

the misuse solely caused the accident while the design defect did not contribute to it."[60] During this inquiry, the Court must determine the intended use of the RnP, and whether Plaintiffs' use of the RnP falls within that scope.[61] Foreseeability of use that falls outside the scope of the product's intended use does not factor into the Court's analysis.[62]

Here, the intended use of the RnP encompasses "day use or overnight sleep in which infants are placed supine (on their backs) at less than a 30-degree angle from horizontal."[63] Defendants argue the intended use also includes use of the restraint system.[64] However, Defendants are conflating the doctrine of unintended use with the concept of misuse.[65] The RnP's intended use, in part, includes use as an overnight sleeper. Plaintiffs utilized the RnP as an overnight sleeper. Plaintiffs' failure to utilize the restraint system falls within misuse, a potential defense for Defendants, but does not fall outside the scope of the RnP's intended use.

---

[60] *Smith v. Yamaha Motor Corp., U.S.A.*, 5 A.3d 314, 321 (2010) (citing *Clark v. Bil-Jax, Inc.*, 763 A.2d 920 (Pa. Super. 2000)).

[61] *See id.*

[62] *Cricket Lighters*, 841 A.2d at 1007; *see also Clevenger v. CNH Am., LLC*, 2008 WL 2383076, at *4 (M.D. Pa. 2008), *aff'd*, 340 F. App'x 821 (3d Cir. 2009).

[63] Op. Br. at 3.

[64] Op. Br. at 4-5.

[65] *Yamaha Motor Corp.*, 5 A.3d at 321.

Unless it is established that Brown's failure to utilize the restraint system solely caused the accident and the design defect did not contribute to it, Brown's failure to utilize the restraint system cannot be grounds for summary judgment. Plaintiff's expert reports establish that the cause of A.B.'s death was related to the RnP's design. Thus, Plaintiffs presented the necessary evidence to overcome summary judgment on this issue. Accordingly, summary judgment as to intended use is **DENIED**.

### 2. STRICT LIABILITY DUTY TO WARN[66]

Defendants contend they are entitled to summary judgment as to Plaintiffs' strict liability duty to warn claims because a clear warning was provided that, if followed, would have prevented A.B. from allegedly moving and becoming asphyxiated.[67] Plaintiffs argue summary judgment should be denied because the RnP warnings were inadequate and not "framed for a parent in the context of positional asphyxiation []."[68]

---

[66] The parties conflate negligent duty (failure) to warn with strict liability duty (failure) to warn. However, "Pennsylvania courts consistently analyze the negligence/failure to warn and strict liability/failure to warn causes of action separately, treating conduct-related counts apart from product-related counts. *Harford Mut. Ins. Co. v. Moorhead*, 578 A.2d 492, 501 (Pa. Super. 1990).

[67] Reply Br. at 17.

[68] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 82:6-8. At oral argument, Plaintiffs contend warnings must be adequate in content, intensity, and dissemination and that a general warning is not adequate where the specific danger requires a more complete and explicit warning. *Id.* at 79:16-22. There are two issues

Under a strict liability duty to warn claim, a plaintiff must establish "the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury."[69]

To determine whether a product is defective, the plaintiff must show that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product unreasonably dangerous.[70]  Under this inquiry, the Court must determine "whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe."[71]  Lastly, the "determination of whether a warning is adequate and whether a product is 'defective'

here that give the Court pause with this analysis.  First, at oral argument, Plaintiffs cite to *Maya v. Johnson and Johnson*, 97 A.3d 1203 (Pa. Super. 2014) as the source of authority.  However, it appears the caselaw excludes such analysis.  Moreover, the language Plaintiffs adopt discussing the adequacy prong appears to be more aligned with either negligent failure to warn or the Restatement (Third) of Torts, cmt. i, which Pennsylvania courts have declined to adopt.  *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399 (Pa. 2014) ("[] the Third Restatement does not offer an articulation of the law sufficient to persuade us to simply abandon the second restatement formulation of the strict products liability cause of action and 'move' to the Third Restatement.").

[69] *Phillips v. A-Best Prod. Co.*, 542 Pa. 124, 131, 665 A.2d 1167, 1171 (1995).

[70] *Id*.

[71] *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 641 (W.D. Pa. 2012) (quoting *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d, 893, 902) (*abrogated by Reott v. Asia Trend Inc.*, 618 Pa. 228, 55 A.3d 1088 (2012) on the issue of highly reckless conduct as an affirmative defense to strict products liability claims).  *See Reott*, *supra*.

due to inadequate warnings are questions of law."[72]  However, "where fact questions exist [] the question of adequacy is one for the jury."[73]

Defendants mainly rely on *Davis v. Berwyn Corp.*[74] and *Roudabush v. Rondo, Inc.*,[75] in which the Pennsylvania courts explained that it is unreasonable to require a manufacturer to warn against dangers that may arise if the stated warnings are not heeded since the law presumes that warnings will be obeyed.[76]  Like in *Davis*, Defendants contend the warnings on the RnP "make plain that the product should never be used without the safety device"[77] "and that the warning addressed the danger and was sufficient to caution the operator."[78]

Despite these warnings, the RnP failed to describe additional dangers inherent in the product—particularly, the possibility of babies rolling in the device and positional asphyxiation.  Reviewing Dr. Ian Noy's expert report, he opines to a reasonable degree of scientific probability that "[t]he deficiencies in the warning

---

[72] *Cohen v. Johnson & Johnson*, 634 F. Supp. 3d 216, 230 (W.D. Pa. 2022) (quoting *Davis v. Berwyn Corp.*, 547 Pa. 260 at 267, 690 A.2d 186 (1997)).

[73] *Id*. (citing *Rowland v. Novartis Pharms. Corp*., 34 F. Supp. 3d 556, 572 (W.D. Pa. 2014)).

[74] 690 A.2d 186 (Pa. 1997).

[75] 2017 WL 3912370 (W.D. Pa. 2017).

[76] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 37:14-38:2 and 41:5-8.

[77] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 38:21-39:2.

[78] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 39:7-12.

system rendered the [RnP] defective and unreasonably dangerous"[79] as they did not appropriately warn of the risk of positional asphyxiation and "the use of restraints may have had little or no benefit in preventing positional asphyxiation in children who had not ended up out of position."[80]

Comparing these circumstances to *Roudabush*, summary judgment was granted in the manufacturer's favor because that the court found the plaintiff made unsupported, conclusory allegations regarding the adequacy of the manufacturer's warnings.[81] Here, Noy's report supports Plaintiffs' challenges to the RnP's warnings beyond conclusory allegations deeming them inadequate and unreasonably dangerous. Since questions of fact exist, the question of adequacy becomes one for the jury.[82] Accordingly, partial summary judgment is **DENIED** for strict liability duty to warn.

---

[79] Ans. Br., Ex. G at 49 ("Dr. Noy's Expert Report").

[80] *See* Dr. Noy's Expert Report at 35, 48; Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 79:1-5.

[81] *Roudabush*, 2017 WL 3912370 at *7.

[82] *Cohen v. Johnson & Johnson*, 634 F. Supp. 3d at 230 (citing *Rowland v. Novartis Pharms. Corp.*, 34 F. Supp. 3d 556, 572 (W.D. Pa. 2014)).

### C. DEFENDANTS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT FOR SPECIFIC CLAIMS OF NEGLIGENCE.

#### 1. NEGLIGENT DUTY TO WARN

As previously mentioned, the parties conflate negligent duty to warn and strict liability duty to warn. However, negligence and strict liability are distinct legal theories.[83] The distinction that lies in negligent duty to warn is that a plaintiff must prove the defendant breached its duty to warn, and that the breach caused plaintiff's injuries.[84] In order to establish a negligent failure to warn claim, a plaintiff must show the absence or inadequacy of the warnings was the factual or proximate cause of the injury.[85] Lastly, "a plaintiff must further establish proximate causation by showing that had the defendant issued a proper warning [ ], [she] would have altered [her] behavior and the injury would have been avoided."[86]

As mentioned above, the jury must determine whether Defendants' warnings on the RnP were adequate.[87] As to causation, only when the absence of an issue of any material fact relating to the question of negligence or proximate cause is shown may summary judgment be granted on motion of a defendant.[88] Here, triable issues

---

[83] *Cricket Lighters*, 841 A.2d at 1008 (Pa. 2003).

[84] *Maya v. Johnson & Johnson*, 97 A.3d 1203, 1213-14 (Pa. Super. 2014).

[85] *Wright v. Ryobi Techs., Inc*, 175 F. Supp. 3d 439, 455 (E.D. Pa. 2016).

[86] *Maya*, 97 A.3d at 1213-14.

[87] *See* Dr. Noy's Expert Report.

[88] *Ebersole v. Lowengrub*, 180 A.2d 467, 469 (Del. 1962).

of fact remain as to whether Brown would have altered her behavior the night before A.B.'s death. Accordingly, partial summary judgment as to negligent duty to warn is **DENIED**.

### 2. SELECTION OF MATERIALS

Defendants seek summary judgment on Plaintiffs' expert references that the materials selected for use in the RnP made the product defective, dangerous, or caused A.B.'s death.[89] Specifically, Defendants argue that Plaintiffs have no expert who opines that the improper selection of any specific material used in the RnP such as padding, plastic, or anything else caused A.B.'s death.[90] Plaintiffs counter Defendants' argument, contending genuine issues of material fact exist as to: (1) whether the RnP was unreasonably dangerous and defective because of the material used and (2) whether Defendants were negligent in selecting that material.[91] At oral argument, Plaintiffs clarified that its reference to Defendants' selection of materials is subsumed under its negligence claim as part of its "global duty to act reasonably across the entire continuum of the [D]efendants['] activities."[92]

At this juncture, triable issues of fact still exist as to whether Defendants' activities breached its duty to Plaintiffs and caused A.B.'s death. Although the

---

[89] Reply Br. at 21-22.

[90] Op. Br. at 34; Reply Br. at 22.

[91] Ans. Br. at 41.

[92] Tr., Oral Argument, C.A. No. N20C-01-067 PAW, at 94:6-10.

experts did not explicitly attribute the RnP's materials to A.B.'s death, an inference can be made as to causation. Plaintiffs point to expert reports from Mannen, Ross, Calhoun, Hoffman, Noy, and Rosen where references to the RnP's materials were made in connection with suffocation and positional asphyxiation.[93]

Like the other reports,[94] Noy's expert report discussed the "consequential risk of asphyxiation inherent in the RnP" and the fact that "A.B. was found on side with face against padding of RnP."[95] With the expert report of Noy and the other reports, Plaintiffs demonstrated a reasonable inference can be made that the materials selected for use in the RnP could have made the product defective, dangerous, or caused A.B.'s death.

Since all inferences are made in favor of the nonmoving party and an issue of material fact remains, partial summary judgment as to any reference regarding the selection of the RnP's materials is **DENIED**.

---

[93] Ans. Br. at 39-41.

[94] Dr. Calhoun's Expert Report at 18; Dr. Hoffman's Expert Report at 19; Dr. Mannen's Expert Report at 32; Dr. Rosen's Expert Report at 26; Dr. Ross' Expert Report at 6.

[95] Ans. Br. at 40; Dr. Noy's Expert Report at 48.

**D.** **THE DUTY TO TEST IS SUBSUMED BY PLAINTIFFS' OTHER CLAIMS, RENDERING THE EVIDENCE ADMISSIBLE.**

Under Pennsylvania law, a breach of a duty to test does not create an independent claim.[96] The manufacturer's duty to test "is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury."[97] To present evidence of a failure of the duty to test, Plaintiffs must show evidence supporting a claim for defective design, manufacture, or warning.[98]

Defendants argue evidence of failure to conform with the duty to test should be inadmissible "to the extent Plaintiffs' claims assert a duty to test."[99] Plaintiffs posit their allegations surrounding Defendants' failure to test the product fall within their claims for negligence and strict liability.[100] In their Reply Brief in Support of the Motion, Defendants additionally argue that evidence of failure to test cannot be admitted in general, even as part of negligence or strict liability claims.[101] Specifically, Defendants claim that Plaintiffs' "argument avoids the issue, which is

---

[96] *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 541 (Pa. Super. 2003), *aff'd*, 584 Pa. 120, 881 A.2d 1262 (2005).

[97] *Lance v. Wyeth*, 4 A.3d 160, 169 (Pa. Aug. 2, 2010), *aff'd in part*, *rev'd in part on other grounds*, 624 Pa. 231, 85 A.3d 434 (2014) (quoting *Kociemba v. G.D. Searle & Co.*, 707 F.Supp. 1517, 1527 (D. Min. 1989)).

[98] *Id.*

[99] Op. Br. at 32.

[100] Ans. Br. at 34.

[101] Reply Br. at 20-21.

22

that negligent failure to test and strict liability failure to test are not viable claims under Pennsylvania law."[102]

While the Court cannot permit a claim based solely on the failure to test as an independent cause of action, the Court may consider evidence of failure to test subsumed within claims for design defect, manufacturing defect, and/or any potential failure to warn.[103] Here, Plaintiffs brought a claim for defective design, manufacture, or warning, which includes their contentions regarding Defendants' alleged failure to test,[104] and a claim for negligence, which also asserts that Defendants failed to adequately test the product.[105] Plaintiffs do not assert an independent claim for the alleged failure to test.[106] Instead, Plaintiffs argue Defendants' breach of its duty to test: (1) led the manufacturer to produce a product that is defective in design, manufacture, or warning; and (2) acts as evidence of Defendants' negligence.

---

[102] Reply Br. at 21.

[103] *See Lance v. Wyeth*, 4 A.3d at 169 (holding that no injury results from a breach of a manufacturer's duty to test within the context of products liability "*unless* the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning…") (emphasis added).

[104] Ans. Br. at 34-38.

[105] Ans. Br. at 15-19.

[106] Ans. Br. at 33-34.

Plaintiffs can introduce evidence of an alleged failure to adequately test under their claims for negligence and design defect. Although failure to test is not an independent cause of action, evidence of lack of adequate testing is admissible under claims for strict liability (to show that the risk of injury was known or knowable had adequate testing been performed)[107] and negligence (to show that the Defendants did not act reasonably).[108]

As explained above, the Court denies partial summary judgment on the Plaintiffs' claims for negligent failure to warn and strict liability failure to warn. Thus, Defendants' alleged failure to perform adequate safety testing is relevant and admissible under the Plaintiffs' claims of negligence and strict liability. Therefore, partial summary judgment as to the duty to test is **DENIED**.

---

[107] *See Lance v. Wyeth*, 4 A.3d at 169.

[108] "Under Pennsylvania law, in order for an injured party to establish a cause of action against a manufacturer based upon the latter's breach of a duty, 'the plaintiff must prove, not only that the product was defective and that the defect caused his[/her] injury, but in addition, [the plaintiff must prove] that in manufacturing or supplying the product the defendant failed to exercise due care.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3rd Cir. 2000) (citing *Dambacher v. Mallis*, 485 A.2d 408, 424 (Pa. Super. 1984)). Thus, to establish negligence arising from a duty to test, a plaintiff must also demonstrate a defect in the product design, that the defect in question caused the injury, and that defendant failed to exercise reasonable care. *Id*. Here, the proffered testimony from the Plaintiffs' experts sufficiently establishes the existence of a defect in design and causation. Thus, evidence of failure to test will be admissible as part of Plaintiff's claim for negligence as evidence of Defendants' alleged failure to exercise due care in manufacturing or supplying the product. *See id*.

**E. DEFENDANTS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT FOR CONSCIOUS PAIN AND SUFFERING.**

Defendants contend Plaintiffs cannot proceed on their claim for conscious pain and suffering because the expert testimony Plaintiffs rely upon should be excluded.[109] Defendants have contemporaneously filed a *Daubert* motion seeking to exclude Ross's and Calhoun's testimony as to conscious pain and suffering.[110] For reasons set forth in the Court's Memorandum Opinion and Order addressing conscious pain and suffering, Defendants' Motion for partial summary judgment on the Plaintiffs' claims of conscious pain and suffering is **DENIED**.

## V. CONCLUSION

For reasons mentioned, Defendants' motion for summary judgment and partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Patricia A. Winston*
**Patricia A. Winston, Judge**

---

[109] Op. Br. at 35.

[110] Defs.' Mot. to Exclude Testimony Regarding Conscious Pain and Suffering, D.I. 166.